UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

TERRY NELSON, JOHN NESSE, CLARK ANDERSON, and GARY MEYERS and their successors in their capacities as Trustees and Fiduciaries of the Painters and Allied Trades District Council No. 82 Health Care Fund, the Painters and Allied Trades District Council No. 82 Vacation Fund, the Painters and Allied Trades District Council 82 STAR Fund, the International Painters and Allied Trades Industry Pension Fund, the Finishing Trades Institute of the Upper Midwest Trust Fund, the National Painting, Decorating, and Drywall Apprenticeship Committee, the St. Paul Painting Industry Pension Fund, the Minneapolis Local 386 Drywall Finishing Industry Pension Fund, the Finishing Trades Institute, the Painters and Allied Trades Labor Management Cooperation Initiative, and each above-named Fund,

        Plaintiffs,

v.

FRANA COMPANIES, INC.; DIAMOND DRYWALL, INC.; DAVID STELLMACH; KAREN STELLMACH; TWIN CITIES DRYWALL, INC.; and JOHN DOES 1-2,

        Defendants.

Case No. 13-CV-2219 (PJS/SER)

FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Carl S. Wosmek, Amy L. Court, and Christy E. Lawrie, MCGRANN SHEA CARNIVAL STRAUGHN & LAMB, CHARTERED, for plaintiffs.

Keith J. Broady and Bryan R. Feldhaus, LOMMEN ABDO P.A.; and
Nicholas A. Dolejsi, ZELLE LLP, for defendant Frana Companies, Inc.

Martin D. Kappenman and Gregory L. Peters, SEATON, PETERS &
REVNEW, P.A., for defendants Diamond Drywall, Inc., David Stellmach,
and Karen Stellmach.

This is an action to recover contributions that are allegedly owed to various
union-sponsored fringe-benefit funds under the terms of various collective-bargaining
agreements ("CBAs").  Plaintiffs are the funds and the trustees of the funds.  Defendant
Diamond Drywall, Inc. ("Diamond") is a drywall contractor that was a signatory to
CBAs that required Diamond to make fringe-benefit contributions to the funds.  Prior to
going bankrupt in 2012, non-party Lincoln Drywall, Inc. ("Lincoln") was also a drywall
contractor and also a signatory to the CBAs.

Under the CBAs, Diamond and Lincoln were contractually obligated to pay their
employees by the hour and to make fringe-benefit contributions based on the total
number of hours worked by those employees.  According to plaintiffs, Diamond and
Lincoln breached the CBAs by paying some employees on a piece-work or "footage"
basis and by not accurately recording or reporting the number of hours that those
employees actually worked.  As a result, plaintiffs allege, Diamond and Lincoln failed
to pay the full amount of the fringe-benefit contributions that they were obligated to
pay under the CBAs.

Plaintiffs further allege that defendant Frana Companies, Inc. ("Frana")—a general contractor that subcontracted drywall work to both Diamond and Lincoln—should be held liable for Diamond's and Lincoln's breaches under an alter-ego theory.  Finally, plaintiffs allege that defendant Twin Cities Drywall, Inc. ("Twin Cities") is the corporate successor to Lincoln and thus should be held liable for Lincoln's breaches.

Based on these core allegations, plaintiffs brought 15 claims against defendants, including claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., the Minnesota Uniform Fraudulent Transfer Act, Minn. Stat. § 513.41 et seq., and the common law.  The Court dismissed all of plaintiffs' claims, save their ERISA and breach-of-contract claims.  The surviving claims were tried in two phases spanning a total of nine days, after which the parties submitted extensive briefing.  Having heard the evidence and considered the briefs, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## I.  FINDINGS OF FACT

### A.  Background

1.     The individual plaintiffs are trustees and fiduciaries of the plaintiff multi-employer fringe-benefit funds.

2.      Diamond is a drywall contractor that specializes in wood-frame multi-family construction.  TT 1264, 1266.[1]

3.      Defendant David Stellmach is the sole owner of Diamond.  TT 483. Stellmach's wife, Karen Stellmach, works as a part-time bookkeeper for Diamond.[2] TT 656.

4.      Twin Cities is a drywall contractor.  TT 914.  Plaintiffs allege that Twin Cities is the common-law successor to Lincoln.  Compl. ¶¶ 184-87.

5.      Frana is a general contractor that specializes in wood-frame multi-family construction.  TT 1258, 1720.  During the period August 15, 2007 through December 31, 2012 (the "audit period"), Frana subcontracted with both Diamond and Lincoln to perform drywall work.  TT 836.

6.      Since 1998, Diamond has been a signatory to CBAs with the Painters and Allied Trades District Council 82 ("the painters' union"), which represents drywall tapers.  P1, P2, P3; TT 484.

7.      Before it went bankrupt, Lincoln was also a signatory to the painters' union CBAs.  TT 858.

---

[1]The Court cites to the trial transcript as "TT __" and to exhibits as "P__" and "D__."

[2]Karen Stellmach was originally named as a defendant, but the Court granted judgment on the pleadings as to all claims against her.  ECF No. 55.

8.      The CBAs require that covered employees be paid by the hour and establish hourly wage rates for those employees.  *See, e.g.*, P2 Art. 9 & Add. A.

9.      The CBAs also require employers to make contributions to the plaintiff fringe-benefit funds for each hour of covered work.  P2, Art. 27; P3, Art. 28.  Each month, employers must report the number of hours worked by covered employees and remit the required contributions to the funds.  TT 858-59.

### B.  Drywall and Multi-Family Construction

10.      Drywall contractors typically employ three types of workers: carpenters, tapers, and laborers.  TT 611-12.  Of these three trades, only tapers are represented by the painters' union.  TT 604-05, 659.

11.      Drywall is hung by carpenters.  TT 611.  Tapers then come through to tape and coat the seams and fasteners and thereby create a finished surface.  TT 15-17, 613-14.

12.      Surface finishes are designated by level, with level 5 being the highest and most time-consuming and level 1 being the lowest and least time-consuming.  TT 15-17. With respect to each level, a finish may be textured or smooth; applying a smooth finish typically takes more time than applying a textured finish.  TT 642, 923, 947-48, 1268.

13.      Tapers tend to finish more square feet per hour in multi-family construction than in commercial construction because ceiling heights are lower and the

finish is often lower level or textured.  TT 642, 854, 878-79, 903-04, 1264-65, 1467.  In

addition, work on multi-family construction projects tends to be highly repetitive, with

each floor having consistent layouts, ceiling heights, and finishes.  TT 1264-65.  Multi-

family construction does not commonly require a level 5 finish (which, again, is the

most labor intensive), and Frana never used level 5 as a primary finish in any of the

buildings that it constructed during the audit period.  TT 878, 1268.

14.     In 2015, Frana constructed the Five15 building, a large wood-frame multi-

family building that was typical of the projects that Frana built during the audit period.

TT 1293.  Diamond was the drywall subcontractor on the Five15 project.  TT 1293-94.

Because the Five15 project was subject to wage oversight, Diamond had to submit

certified payrolls to the Department of Housing and Urban Development and the City

of Minneapolis.  TT 1296.  Representatives from these agencies regularly visited the site

to interview workers and verify that they were being paid for all of the hours that they

worked.  TT 1296-97.  Based on the square footage of the project and the certified

payroll records, Diamond's productivity rate for the Five15 project was 116 square feet

per hour.  TT 1299.

*C. Diamond*

1. Diamond's Footage System

15.     During the audit period, Diamond paid most of its tapers by the hour, as Diamond was required to do under the CBAs.  Diamond did, however, pay a small number of its tapers on a unit or "footage" basis to give them an incentive to work faster.

16.     Diamond's footage system worked as follows:  Stellmach would determine an amount that he would pay for a unit of work (such as a single apartment in a multi-unit building).  TT 586.  The tapers working "on footage" would report units worked (rather than hours) or a combination of units and hours.  TT 535-36.  Stellmach would then divide the unit price by the hourly wage to calculate a number of hours, and Diamond would calculate its obligations to the funds based on that number of hours.  TT 536, 547-52, 659-61, 684.  So, for example, if a taper completed three apartments at $300 per apartment, the taper would be owed $900.  If the taper's hourly wage was $30 per hour, Stellmach would report that the taper had worked 30 hours, regardless of how many hours the taper had actually worked.  Karen then used that number of hours to generate payroll and report covered hours to the funds.

17.     A footage system can work to either the advantage or the disadvantage of the funds.  If, in the above example, the taper actually worked 25 hours, then the funds

would benefit from the footage system, as Diamond would report and make contributions on 30 hours of covered work, when the funds were entitled to receive contributions on only 25 hours. But if the taper actually worked 35 hours, the funds would be cheated, as they would receive contributions on only 30 hours of covered work, when they were entitled to receive contributions on 35 hours.

18.     As will be discussed below, the footage system used by Stellmach during the audit period generally resulted in Diamond reporting more covered hours to the funds than the employees actually worked. This makes sense, as the purpose of the footage system was to provide an incentive for tapers to work quickly, and the footage system would fail of its purpose unless it gave tapers a realistic opportunity to earn more money than they would earn if they were paid by the hour. Over the course of the audit period, then, both the employees and the funds profited from Stellmach's use of the footage system.

19.     At the end of a project, Stellmach discarded any notes or other documents that would have reflected the unit prices that he set for that project. TT 589. Stellmach discarded the documents because he had no use for them; he did not do so because he thought that he was violating the CBA and was attempting to hide evidence of that fact.

20.     Approximately 150 tapers worked for Diamond at some point during the audit period. TT 556. Only about ten or eleven of those tapers were ever paid on the

footage system.  TT 622.  Thus, over 90 percent of the tapers who worked for Diamond during the audit period were never paid on the footage system.

## 2.  Diamond's Payroll Records

21.     Stellmach paid all of his employees every week with payroll checks; he never paid cash.  TT 923, 929, 951-52, 993-94, 996, 999.

22.     Diamond tapers who were paid hourly would either turn in a timecard or report their hours to Stellmach.  TT 532, 630-31.

23.     Each week, Stellmach recorded his employees' hours on a sheet that he gave to his wife, Karen.  TT 532-33, 630-31.  Karen recorded the information from these sheets in handwritten ledgers and accounting software, which she used to generate weekly paychecks and monthly remittance reports to the funds.  TT 630-31, 658-61, 684.  After recording information from the sheets, Karen returned the sheets to Stellmach, who eventually discarded them.  TT 532-33, 550, 661.  Stellmach discarded the sheets because he had no more use for them, not because he was trying to hide anything.

24.     Stellmach kept timecards in a stack on a ledge in his office.  TT 514-15.  When the stack got so tall that it started to tip over, Stellmach would discard a chunk of cards from the bottom of the stack in order to bring the stack down to a manageable height.  TT 515-16.  Stellmach was not aware that he was obligated to retain timecards until a union official informed him of that fact sometime around 2013.  TT 512, 530.

### 3.  Diamond's Audits

25.     Approximately every 18 months, Wilson-McShane, a firm retained by the funds, audited Diamond's payroll records.  TT 513-14, 678.  Wilson-McShane never told the Stellmachs that their records were inadequate.  TT 636, 692, 694, 1039-40.  If Wilson-McShane had told the Stellmachs to retain timecards or other records, the Stellmachs would have done so.  TT 636, 692.

26.     With one exception involving Diamond's use of a subcontractor called Quality Sanders (discussed below), Wilson-McShane sent a letter after every audit stating that Diamond's remittance reports accurately reflected Diamond's underlying records.  TT 694-96; *see, e.g.*, D112; D115.

27.     In January 2012, Wilson-McShane sent a letter requesting an audit.  D124.  In the past, similar letters had requested that Diamond produce seven categories of records.  *See, e.g.*, D113.  The January 2012 letter added an additional seven categories of records, including job-cost detail reports, the master payroll file, monthly and annual financial statements, tax returns, job files, estimating documentation, and job-analysis reports.  D124.  It appears that this request for additional information came about because Dustin Partain, a Diamond taper, had complained to the union about Diamond's footage system sometime in 2011.  TT 779-83.  The evidence suggests, however, that both the union and the funds were already aware of—and appeared to

tolerate—the footage system.  TT 779-82, 816-18, 959, 967, 970.  In any event, the

January 2012 audit request spawned a dispute over the production of records, and that

dispute ultimately led to this lawsuit.

### 4. Testimony from Tapers Employed by Diamond

28.     Walter, Dustin, and Troy Partain—a father and two sons—are the only

Diamond tapers who testified that they may have been shorted hours under the footage

system.  None of the other 150 or so tapers who worked for Diamond during the audit

period—each of whom was a member of the painters' union—complained to the union

or to anyone else about the footage system.  None of the three Partains could identify

any weeks that they were underpaid, and none of them could quantify the amount by

which they were underpaid.  TT 723-24, 731-33, 739-40, 773-74, 777-78, 801, 812, 816.

29.     Troy Partain could not say for certain that he *was*, in fact, underpaid.

TT 731-32.

30.     Dustin Partain testified at trial that he was certain that he had been

underpaid, TT 773, but this trial testimony conflicted with his deposition testimony that

he did not know if he had been underpaid, TT 777-78.

31.     In contending that they were probably underpaid when working under

the footage system, both Walter and Troy emphasized the loss of overtime.  TT 731-32,

739, 802-03, 814-15.

32.     Walter testified that, of all of the Diamond tapers, he and perhaps Dustin were harmed the most by the footage system.  TT 826.  Walter also testified that, at the same time that he and Dustin were being harmed, other Diamond tapers were getting easier work (and (presumably) making more money than they would make if paid by the hour).  TT 807-09, 826.

33.     On one occasion in 2007, Walter asked to be paid hourly instead of under the footage system.  Stellmach accommodated his request.  TT 799-800.  On the next project, however, Stellmach returned to paying Walter on a footage basis.  TT 800-01.  Walter did not complain or again ask to be paid hourly.

34.     Walter was an active member of the painters' union who attended meetings nearly every month, but Walter never complained to the union about short pay.  TT 819.  A few years before he retired, Walter told a union organizer that Diamond was paying him under a footage system, but Walter did not claim that, as a result, he was being shorted pay.  TT 816-19.  Although Walter testified that he often complained to Stellmach "about the things that were going on," TT 801-02, this vague statement is likely a reference to Walter's ongoing complaints about his foreman—whom Walter said he "hated" and regarded as "the real problem" at Diamond—as well as Walter's ongoing complaints about Stellmach's willingness to hire workers of Mexican ancestry, TT 810-11, 826-27.

35.     Dustin testified that he could have opted out of the footage system and been paid hourly, but he chose not to exercise that option.  TT 788-89.  He also testified that he sometimes complained about working footage, but the context of his testimony indicates that he was complaining about the footage *rates*—i.e., he sometimes thought that the per-unit rate was set too low to give him a reasonable opportunity to earn more than he would earn if paid by the hour.  TT 771-73.

36.     Ten other Diamond tapers—including four who worked on the footage system—testified that they were never shorted hours.  Of the four who worked footage, three testified that they always made more than their hourly rate, TT 929, 938, 944, 948, and the fourth testified that he made more than his hourly rate most of the time and at worst equaled his hourly rate, TT 922, 924-26.  The remaining six tapers were all paid by the hour and were never shorted pay.  TT 951-52, 993-94, 996, 999, 1002; D268 at 29-32.

37.     The extra pay that tapers made under the footage system was substantial, on the order of several hundred dollars per week.  TT 922 (taper averaged around $300 extra per week); TT 929-30 (taper usually earned 6 to 8 extra hours of pay each week); TT 938 (taper averaged around $250 extra per week).  As a result, Diamond likely made thousands (or tens of thousands) of dollars in fringe-benefit contributions to the funds that Diamond was not required to make under the CBAs.

38.     An additional seven tapers submitted affidavits stating that they were never shorted hours.  D55.

### 5.  Diamond's Subcontracting

39.     On one occasion prior to the beginning of the audit period, Diamond hired a non-union subcontractor.  Stellmach was not aware that hiring a non-union subcontractor was a breach of the CBA.  TT 651.  The auditor discovered Diamond's breach and informed Stellmach that he could hire only union subcontractors.  TT 651, 486-87, 510.  Stellmach did not again knowingly hire a non-union subcontractor.

40.     In 2009 and 2010, Diamond subcontracted with Quality Sanders. Diamond hired Quality Sanders because Stellmach had been told that it was a union contractor.  In fact, Stellmach had been misinformed, as Quality Sanders was a non-union contractor.  TT 636-37, 651, 486-87; D121.

41.     In September 2011, the auditor sent Diamond an invoice for $61,881.41 in delinquent contributions and $6,188.14 in liquidated damages based on Diamond's subcontract with Quality Sanders.  D46 at 6319.

42.     There is no indication that Diamond attempted to conceal its subcontract with Quality Sanders from the auditor.

43.     Diamond did not dispute its liability or the amount of damages on the

Quality Sanders invoice.  D46 at 6321.  Instead, Diamond asked that the amount be

waived because it had acted in good faith.  *Id.*

44.     The funds denied Diamond's request for waiver and stated that their

attorneys would be in contact regarding a payment plan.  D46 at 6322.  In fact, though,

no one ever contacted Diamond about making payment.  TT 598, 677-78.

*D.  Lincoln*

45.     Lincoln was owned by Kevin Dvorak.  TT 858.

46.     Like Diamond, Lincoln paid its drywall employees a bonus to give them

an incentive to work quickly.  Specifically, Dvorak would calculate how many drywall

sheets he thought his workers could finish in a week.  TT 873, 875.  If the workers

finished more, Dvorak would pay them a bonus on top of their hourly wage.  TT 873-74.

47.     Unlike Stellmach, Dvorak did not add more hours to his employees'

paychecks and thus report more covered hours to the funds.  TT 873-74.  Instead,

Dvorak would give his employees bonus checks from a company called Manty

Enterprises ("Manty") in addition to their regular payroll checks from Lincoln.  TT 874.

Manty was a non-union subcontractor also owned by Dvorak.  TT 837; D158 at 1-2.

48.     Both Dustin and Walter Partain occasionally worked for Lincoln.  TT 786,

821, 876.  They were the only Lincoln tapers to testify.  They testified that Lincoln never

shorted their hours or pay and that they did not know whether they got paid less than

union scale.  TT 785-86, 822-25.  Neither of them specified any weeks in which they may

have been underpaid nor any amounts by which they may have been underpaid.

49.    Walter testified that, because Lincoln did not pay fringe benefits on his

Manty check, Lincoln must have shorted his fringe benefits.  TT 822.  Walter admitted,

however, that fringe benefits were properly withheld from his Lincoln paychecks.

TT 822-23.

50.    In October 2010, the painters' union filed a grievance against Lincoln and

Manty, claiming that (unionized) Lincoln was diverting work to (non-unionized)

Manty.  D157 at 2; D158.

51.    The Joint Trade Board found that Lincoln and Manty had violated

provisions of the CBA prohibiting a non-union company owned by a signatory from

performing covered work and prohibiting a signatory from subcontracting work to a

non-signatory.  D158 at 7.

52.    To calculate damages, the Joint Trade Board assumed that all payments

made by Manty to *anyone* were for covered work and divided the gross pay by the

hourly rate.  D158 at 8-11.  The Board awarded approximately $280,000 in damages

against Lincoln, Manty, and Dvorak, including approximately $125,000 to the fringe-

benefit funds.  D158 at 11.

53.     At least some of the Manty payments on which this award was based were not, in fact, for covered work.  For example, the award included amounts that Manty had paid to carpenters, outside vendors, Dvorak's accountant, and members of Dvorak's family who helped out around the office.  TT 889-90, 893-94.

54.     In early 2012, as a result of the Joint Trade Board award, Lincoln filed for Chapter 7 bankruptcy.  TT 891-92; D160.  The funds filed a proof of claim in the bankruptcy proceeding for $322,105.73.[3]  TT 892; D166.  The claim was allowed, D169 at 13, 16, and the bankruptcy trustee eventually paid $28,355.32 to the funds.  TT 360; P66.

55.     Dvorak discarded Lincoln's records at the end of each year and after Lincoln filed for bankruptcy.  TT 859-61.  Dvorak did so because he no longer needed the records, and not because he was seeking to hide any violation of a CBA.

### E.  Plaintiffs' Damages Calculations

56.     Plaintiffs' central claim in this lawsuit is that, because Diamond paid some of its tapers on a footage system, the number of covered hours that Diamond reported to the funds was less than the number of covered hours actually worked by the tapers. Plaintiffs likewise claim that Lincoln underreported hours to the funds as a result of its incentive system.

---

[3]It is not clear why the bankruptcy claim was nearly $200,000 more than the Joint Trade Board award.

57.     To ascertain whether either Diamond or Lincoln underreported hours, one must first calculate the number of hours actually worked by Diamond and Lincoln tapers and then compare that figure to the number of hours reported to the funds.  The number of hours reported to the funds is undisputed, but the number of hours actually worked by the tapers is vigorously disputed.  That number necessarily must be estimated, given the absence of records from Diamond and Lincoln.

58.     Two main factors are used to estimate the number of hours that a taper worked on a project:  the total number of square feet that the taper finished and the taper's productivity rate.  If, for example, a taper finished 10,000 square feet, and the taper's productivity rate was 116 square feet per hour, the taper likely worked about 86 hours.

59.     Productivity rates can vary dramatically from taper to taper and project to project.  Productivity rates are affected by, among other things, the finish level, the height of the walls and ceilings, the number of corners, the number of cutouts for windows and doors, the humidity, how long it takes the taper to get himself and his materials to the job site (getting to the fifth floor takes longer than getting to the first floor), the frequency of interruptions by other workers on the job site, and, of course, the skill, training, and diligence of the particular taper.

60.     Plaintiffs estimate that, during the audit period, Diamond failed to report 59,531 covered hours and Lincoln failed to report 10,144 covered hours.  P47 at 19 (Diamond); P63 at 4 (Lincoln).

61.     To support these numbers, plaintiffs presented testimony from Chad Chapman of Faithful+Gould ("F+G") and Craig Siiro, a financial consultant and forensic accountant.

62.     Chapman opined that the average productivity rate for a taper is 82.5 square feet per hour.  TT 85-87, 185.

63.     Chapman derived this rate using five sources of data.  P478-0033 (chart listing five data sources).  These sources include:

a.      productivity rates reported by RS Means, a construction firm that annually publishes a manual to assist in estimating the costs of construction projects, TT 71;

b.      cost data contained in F+G's proprietary database, TT 79-80, 108, 179;

c.      bidding rates from Custom Drywall, a local drywall contractor, TT 76-78; D258;

d.      cost data from Greencore, a construction project in Rhode Island, TT 78, 158-59, 196; and

e.      bidding rates from Gibbs, a New Orleans drywall contractor,

TT 163-65; D259.

64.     To derive a productivity rate from F+G cost data, Chapman divided the

cost of the drywall work on a project by the hourly rate and then by the square footage.

TT 108.  For example, if a drywall subcontractor was paid $51,000 on a project and the

hourly rate for taping was $30, this calculation would indicate that the tapers worked a

total of 1700 hours.  If the project involved 153,000 square feet, the productivity rate of

those tapers was about 90 square feet per hour.

One problem for Chapman was that the cost data from F+G included more than

wages paid to tapers; it also included overhead, hanging (which is not done by tapers),

materials, and other expenses.  To correct for this fact, Chapman used his experience to

make an educated guess about what fraction of the total amount paid to the drywall

subcontractors represented taping costs.  TT 108-15.  Chapman did not know how many

of the projects in the database were wood-frame, multi-family projects.  TT 195-96.

65.     The bidding rates from Custom Drywall are "all in" rates, meaning they

too include amounts for overhead, materials, and profit.  TT 76, 151.  To derive a

productivity rate from this information, Chapman "speculated" as to the drywall finish

level and, based on his experience, made an educated guess about what portion of the

rate represented labor costs.  TT 109-10, 151, 156-57.  Jason Kern, who is actually

employed by Custom Drywall as an estimator and project manager, testified that

Chapman's estimated productivity rate was inaccurate and too slow.  TT 1095-97.

66.     Greencore was a large industrial construction project in Rhode Island.

TT 78, 158-59, 163.  It had a level 5 finish (the slowest finish—and one that was never

used as the primary finish on a Frana project) and minimal drywall finishing work

(unlike all Frana projects).  TT 158-59.  Unlike multi-family construction, the Greencore

project did not include repetitive floor plans.  TT 162.

67.     As with the Custom Drywall rate, Chapman derived a drywall

productivity rate for Greencore from a monetary value—in this instance, from an

amount listed for the Greencore drywall work on a schedule of values.  Chapman did

not know whether the amount included profit.  TT 160-62.

68.     Chapman obtained the Gibbs rate by contacting a New Orleans drywall

contractor, who emailed bidding rates for level 4 and level 5 finishes.  D259.  As with

Custom Drywall, Chapman used these prices to derive a productivity rate.  But

Chapman did not know if the bidding rates were all-in numbers or whether Gibbs uses

union labor.  TT 164-66.  Because Chapman originally (and erroneously) believed that

Frana's projects included a lot of level 5 finish work, he used only the level 5 price from

Gibbs.  TT 93-95, 142-43, 165.  As noted, Frana's projects involved little or no level 5

finish work.

69.     Siiro calculated that Diamond performed drywall finishing on 14,682,791 square feet during the audit period with respect to what plaintiffs call "project billings"—that is, billings in excess of $100,000.  TT 272, 285.  Siiro based this calculation on Frana's internal spreadsheets.  TT 393.

70.     As is common in the industry, Frana's spreadsheets are based on the "gross" square footage. TT 120, 1269-73.  Because the gross square footage is based on carpentry measurements (which build in a "waste" factor) and because the estimates do not subtract window and door openings, elevator shafts, and the like (which obviously do not require drywall work), the gross square footage tends to overstate the area on which tapers work by about 10 percent.  TT 1272.

71.     Chapman (the expert from F+G) measured the "net" square footage of certain Frana projects; his measurements were nine percent lower than Frana's internal numbers and thus nine percent lower than the numbers used by Siiro.  D234.

72.     Based on Chapman's productivity rate and his own square-footage calculation, Siiro calculated that Diamond should have reported 172,946 hours for project billings during the audit period.  TT 289; P51 at 5.

73.     To determine the number of Diamond's "*non*-project" hours, Siiro first divided the total project billings by 172,946 to come up with an average project cost of $124.77 per hour.  TT 289-90; P51 at 5.  Siiro then divided the total non-project billings

by $124.77 to calculate that Diamond should have reported 13,547 hours for non-project work during the audit period.  TT 295; P53 at 10.

74.     Subtracting Diamond's reported hours from Siiro's estimate of the total hours yields 59,531 purportedly "missing" hours for the audit period.  P47 at 19.

75.     To calculate Lincoln's total hours for the audit period, Siiro performed the same type of calculation that he performed to calculate Diamond's non-project hours: He divided Lincoln's total billings by $124.77, which yielded a figure of 29,326 hours. P63 at 4; TT 289-90.  Subtracting Lincoln's reported hours yields 10,144 in purportedly "missing" hours.  P63 at 4.

## II.  CONCLUSIONS OF LAW

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.     Plaintiffs bring ERISA and breach-of-contract claims against Diamond; a claim that Twin Cities is liable as the successor of Lincoln; a claim that Diamond and

Lincoln were the alter egos of Frana;[4] and a claim that David Stellmach is personally

responsible for liabilities of Diamond that arose before April 30, 2012.[5]

### A.  Alter Ego

3.      To prove that Diamond and Lincoln were the alter egos of Frana, plaintiffs

must prove that (1) Frana controlled Diamond and Lincoln "to the extent that [they had]

independent existence in form only" and that (2) the companies' separate corporate

existence was "used as a subterfuge to defeat public convenience, to justify wrong, or to

perpetuate a fraud."  *Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors,*

*Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997).  Plaintiffs have failed to establish either factor

with respect to either subcontractor.

---

[4]Plaintiffs originally pleaded, in the alternative, that Frana is liable under theories of piercing the corporate veil, agency, and joint venture.  Plaintiffs did not brief these alternative theories, and the Court therefore deems them abandoned.  *See* ECF No. 333 (post-trial order requiring plaintiffs to "specifically describe the relief being sought from each defendant, identify the legal theory or theories supporting that claim for relief, and provide supporting analysis").  In any event, the Court saw no evidence to suggest that any of these theories was stronger than plaintiffs' alter-ego theory.

[5]The Court previously dismissed plaintiffs' claim that Stellmach is personally responsible for Diamond's liabilities under the CBA that took effect on May 1, 2012. ECF No. 55 at 5.

1.  Diamond

4.      Frana did not control Diamond.

During the audit period, Diamond and Frana enjoyed a cooperative, mutually beneficial working relationship that was marked by a high degree of trust.  Nearly all of Diamond's work was for Frana, TT 1384, and Frana used Diamond more than it used any other drywall contractor, TT 1558.  Frana also gave Diamond preferential treatment. Most significantly, to help Diamond with its cash-flow problems, Frana paid Diamond in weekly installments rather than according to the terms of their standard written contracts.  TT 1391, 1850-52.  This type of favorable treatment was not unique to Diamond, however; Frana regularly agrees to pay its subcontractors early and has between five and ten subcontractors that it pays on a weekly basis.  TT 1851-52, 1854.

Plaintiffs attempt to characterize evidence of this cooperative relationship as evidence that Frana was actually in control of Diamond.  The Court finds otherwise. Although Frana and Diamond worked very closely together, they are and always have been separate companies.  Stellmach founded Diamond with no involvement or capital from Frana.  TT 1508-13.  The companies have never shared common ownership. TT 1512.  Diamond entered into CBAs with no input from Frana.  TT 1512.  With the exception of a single out-of-state project that Stellmach was unable to personally

supervise, TT 1487-89, 1513-16, Diamond did its own hiring and firing without any involvement from Frana, TT 1513-16, 1537.

Stellmach decided on his own to implement the footage system, and he neither disclosed it to Frana nor sought Frana's approval.  TT 1518, 1546-47.  Diamond did its own estimating, negotiated its contract prices with Frana, and was free to work for other general contractors and turn down Frana projects.  TT 1467, 1523, 1533-38. Stellmach set his and his wife's salaries with no input from Frana.  TT 1401, 1516. Diamond retained its own accountant, ran its own payroll, filed its own taxes, controlled its own checking account and line of credit, and obtained its own insurance. TT 1517-20.  Although Frana agreed to pay Diamond weekly and always paid the amount invoiced by Diamond, Frana did not agree to bear all of Diamond's risk.  On one occasion, when Diamond carpenters made a costly mistake, Diamond remedied the problem at its own expense and did not attempt to bill Frana.  TT 1869-73.

Plaintiffs emphasize that Diamond often billed Frana substantially more on projects than the agreed-upon contract price.  That is true, but that does not establish that Frana controlled Diamond.  Instead, the evidence indicates that Diamond and Frana treated the contract price as a benchmark against which to measure progress and that Diamond was in constant, close communication with Frana about any changes in the scope and progress of the work.  TT 1448, 1465, 1539, 1764.  The preferential

treatment that Frana gave Diamond in regard to payment and contract price simply reflects that Frana trusted Diamond and very much valued the high quality of Diamond's work.  TT 1712, 1725-26, 1730-31.  It also reflects Frana's business philosophy, which is to cultivate long-term relationships with good subcontractors and good customers.  TT 1717-19, 1853.

Plaintiffs point to Stellmach's idiosyncratic practice of itemizing his expenses on every Diamond invoice as evidence that Frana tracked and paid all of Diamond's expenses and therefore controlled Diamond.  Of course, when nearly all of a company's business is with one customer, it is inescapable that the customer pays all of the company's expenses.  That does not mean, however, that the customer is in control of the company.  Frana did not ask Stellmach to itemize his overhead expenses, TT 1414-15, 1420, 1763, 1853, and Stellmach allocated overhead to non-Frana projects, TT 1393-94, 1429.[6]  This practice appears to reflect Stellmach's lack of formal business training as well as his tendency to be honest to a fault, both of which were evident during his trial testimony.  It is true that Frana created the invoice form that Stellmach used, but Frana

---

[6]Peter Donnino, the current CEO of Frana, testified that, according to his understanding of Frana's oral agreement with Stellmach, Stellmach would provide a detailed list of operating expenses that would be paid as necessary and that Frana could use to understand drywall costs.  TT 1558-59.  As Donnino admitted, however, he was not involved in reaching the oral agreement, TT 1558; the Frana employee who actually negotiated the oral agreement was Mike Benedict, whose testimony (cited above) indicates that Frana did not ask Stellmach to itemize his expenses.

did so to provide Stellmach with a user-friendly form that reflected Stellmach's normal invoice practice, not because Frana dictated or even requested that practice.  TT 1432-35, 1568-70, 1584, 1627-28, 1763.

Plaintiffs also argue that Diamond was undercapitalized during the audit period. Running a drywall company out of one's home is a low-overhead business, however, TT 1839-40, and Diamond's main liability was a debt to Stellmach's in-laws that he does not expect to be asked to repay, TT 1509.  Diamond was profitable in every year but one during the audit period, TT 1791, and Diamond would have been more profitable had the Stellmachs chosen to take their income as distributions rather than salary, TT 1809-10.  Thus, although Diamond may have been insolvent as a technical matter throughout the audit period, the Court does not regard this as significant under the circumstances.

Given the long and close relationship between Frana and Diamond, it is not surprising that plaintiffs are able to cherry-pick instances in which it appears that one party is directing the other party to do something.  But when the evidence is considered in its entirety—that is, when the forest is not lost for the trees—it becomes clear that Frana and Diamond's close working relationship and willingness to dispense with written formalities simply reflected the fact that the companies understood one another's business, anticipated each other's needs, trusted each other, and worked together smoothly and efficiently.  Having carefully reviewed the record, the Court

finds that Frana and Diamond are independent companies and that Frana did not control Diamond during the audit period.

5.     The separate corporate forms of Frana and Diamond were not used as a subterfuge to defeat public convenience, justify wrong, or perpetuate a fraud.

Even if plaintiffs had proven that Frana controlled Diamond, plaintiffs could not meet the second prong of the alter-ego test—i.e., plaintiffs could not prove that Diamond's separate corporate form was a subterfuge to defeat public convenience, justify wrong, or perpetuate a fraud.  The wrongdoing at issue here is Diamond's alleged underpayment of fringe-benefit contributions and destruction of records to hide these underpayments.  But Frana had nothing to do with—indeed, was not even *aware* of—Diamond's use of the footage system or any resulting underpayment of fringe-benefit contributions.  TT 1518, 1546-47.  Moreover, Frana had nothing to do with—and, again, was not even *aware* of— Diamond's allegedly faulty recordkeeping.[7]

Plaintiffs initiated this action by filing a 15-count complaint—asserting RICO, fraud, and other claims—premised on the theory that Frana was an evil general contractor that operated Diamond as a sham subcontractor in order to gain access to union labor while shielding itself from audits so that it could freely cheat its workers

---

[7]The fact that Frana had no involvement in or knowledge of either Diamond's footage system or Diamond's recordkeeping practices is yet more evidence that Frana did not control Diamond.

and the fringe-benefit funds.  The evidence makes clear, however, that plaintiffs'

conspiracy theory bears no resemblance to reality.

In sum, the Court finds that Frana did not control Diamond, that Frana did not

use Diamond as a subterfuge to perpetrate any kind of wrong, and that Frana and

Diamond are therefore not alter egos.

## 2.  Lincoln

6.      Frana and Lincoln were also not alter egos.

What little evidence there is in the record concerning Frana and Lincoln's

relationship is at odds with plaintiffs' allegation that Lincoln was another sham

drywaller used by Frana to cheat its unionized work force and the fringe-benefit funds.

Frana had no involvement in starting Lincoln, had no ownership interest in Lincoln,

had no officers or employees in common with Lincoln, and had no involvement in

Lincoln's banking or insurance.  TT 1755-56.  Not only did Lincoln contract with

companies other than Frana, TT 1760, Lincoln actually did relatively little work for

Frana, TT 1674.  It is true that Frana agreed to pay Lincoln earlier than their contracts

required, TT 1876-77, and it is true that on a single occasion Frana paid delinquent

contributions that Lincoln owed to a fringe-benefit fund.  As noted, however, Frana

commonly agreed to pay its subcontractors early.  And Frana did not pay Lincoln's

delinquent contributions to benefit Lincoln, but instead to avoid a lien and thereby keep

a customer happy.  TT 1864-66.  Notably, Frana did not pay off any of the debts that

forced Lincoln into bankruptcy.

Frana and Lincoln were not alter egos.[8]

7.      Because the allegedly unlawful conduct that is the basis of this lawsuit

was committed by Diamond and Lincoln, and because neither Diamond nor Lincoln

was an alter ego of Frana, Frana owes nothing to plaintiffs.

B.  Damages against Diamond and Lincoln

1.  The Burden of Proof

8.      Because Diamond and Lincoln appear to have breached their duties under

ERISA to maintain adequate records, plaintiffs have a relaxed burden of proof.

Specifically, plaintiffs must merely (1) prove that Diamond and Lincoln underreported

covered work and (2) offer "sufficient evidence to show the amount and extent of that

work as a matter of just and reasonable inference."  *Anderson v. Mt. Clemens Pottery Co.*,

328 U.S. 680, 687 (1946).  If plaintiffs meet their burden, then the burden shifts to

Diamond and Lincoln to "come forward with evidence of the precise amount of work

---

[8]It is not entirely clear whether plaintiffs contend that Frana and Twin Cities are
alter egos.  To the extent plaintiffs may be making such a claim, the Court rejects it for
lack of evidence.

performed or with evidence to negative the reasonableness of the inference to be drawn

from [plaintiffs'] evidence." *Id.* at 687-88.[9]

Plaintiffs contend that, once they establish that Diamond and Lincoln breached

their recordkeeping obligations, they need only prove the fact of damage—i.e., that at

least one hour of covered work was not reported to the funds.  At that point, plaintiffs

contend, the burden shifts to Diamond and Lincoln to either prove the exact number of

hours for which contributions were owed or else rebut plaintiffs' damage calculations.

To support their argument, plaintiffs cite four cases:  *Combs v. King*, 764 F.2d 818 (11th

Cir. 1985); *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333 (9th

Cir. 1988); *Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692 (6th

Cir. 1994); and *Laborers' Pension Fund v. RES Environmental Services, Inc.*, 377 F.3d 735

(7th Cir. 2004).

As in this case, the plaintiffs in each of those four cases were benefit funds that

had sued to recover allegedly delinquent contributions under ERISA.  All four of the

---

[9]Diamond denies that it failed to maintain adequate records, but the Court need not resolve this issue because plaintiffs cannot prevail even under their reduced burden.

Defendants also argue that this burden-shifting framework does not apply at trial.  *See Chi. Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 265 (7th Cir. 2003) ("Once a case comes to trial, . . . the burden-shifting structure has served its function and falls away.").  The Court tends to agree with defendants, but again, as plaintiffs cannot prevail even under this framework, the Court need not resolve the issue.

cases cite or otherwise derive from the Supreme Court's decision in *Anderson*, which

created a burden-shifting framework for wage claims under the Fair Labor Standards

Act.  But to the extent that these cases imply that a plaintiff is required to show only

deficient recordkeeping and the fact of some damage, these cases skip an important step

explicitly required by *Anderson* and emphasized by many other cases applying

*Anderson*:  Even after showing deficient recordkeeping and the fact of damage, a

plaintiff must still provide "sufficient evidence to show the amount and extent of that

work as a matter of just and reasonable inference."  *Anderson*, 328 U.S. at 687.

As the Eighth Circuit has made clear, the evidentiary burden on such a plaintiff

is not altogether eliminated.  *See Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059-60 (8th

Cir. 2014) (FLSA case applying *Anderson* and finding plaintiff's evidence insufficient to

withstand summary judgment); *Carmody v. Kan. City Bd. of Police Comm'rs*, 713 F.3d 401,

406-07 (8th Cir. 2013) (same).  A plaintiff cannot simply prove that adequate records

were not kept and that at least one hour was not reported, throw out a dollar figure,

and then recover that dollar figure unless the defendant can prove the exact number of

hours that were underreported.  Rather, the defendant need not prove anything unless

the plaintiff first (1) proves that adequate records were not kept, (2) proves that covered

work was not reported, *and* (3) offers sufficient evidence to allow the court to find "as a

matter of just and reasonable inference" the "amount" and the "extent" of the underreported hours.  Only then does the burden shift to the defendant.

The Court therefore examines whether plaintiffs have proven the fact of damage and whether their expert evidence regarding damages is sufficient to show the amount and extent of the damage "as a matter of just and reasonable inference."

### 2.  Diamond

9.     With the exception of the undisputed Quality Sanders underpayment, plaintiffs have failed to prove that Diamond underreported covered work during the audit period.

To meet their burden to show the fact of damage as to Diamond, plaintiffs cite (1) the Partains' testimony; (2) evidence that Diamond improperly used non-union subcontractors; (3) evidence that Diamond used carpenters to perform tapers' work; and (4) evidence that Diamond intentionally falsified and destroyed records of hours worked.

The Court finds that the Partains' testimony was generally credible.  The Court also finds that, as a result of the footage system, one or more of the Partains was likely underpaid on one or more projects.  But that fact does not establish that the *funds* were underpaid.

The evidence is clear that any underpayments of any of the Partains were uncommon and minimal. The Partains were unable to say when or by how much they were underpaid. Both Walter and Dustin admitted that they could have chosen to switch to hourly pay—and, on the one and only occasion on which any Partain asked to be paid hourly, Stellmach readily complied with the request. Walter never complained about his pay to the union despite regularly attending union meetings, and the Partains' demeanor indicated that they are not the type of people who keep complaints to themselves. Taken together, the evidence strongly suggests that, like the other Diamond tapers, the Partains usually made more than their hourly rate through the footage system; the Court is quite certain that none of the Partains would have tolerated losing substantial amounts of money on a regular basis without complaint. At most, then, the Partains' testimony establishes that they were underpaid minimally and infrequently.

At the same time, the evidence (including the Partains' testimony) also indicates that any underpayment to the funds related to the Partains would have been more than offset by Diamond's consistent and substantial overpayments to the funds with respect to the other tapers who worked under the footage system. Only about ten employees ever worked footage, and four of them testified that they regularly made well over their hourly rate. Walter himself testified in effect that, even when he was being paid less

than hourly, other employees were making more than hourly.  This only makes sense.
The footage system was meant to give the tapers a financial incentive to work quickly; it
would not have worked unless it gave the tapers a reasonable chance to earn more than
they could earn being paid by the hour.  The reason why the three Partains and the
other seven or eight tapers worked footage for so long without complaint and without
opting to be paid hourly was the obvious reason:  On balance, they earned more
working footage than they would have earned being paid by the hour.

As described above, Stellmach paid employees the "extra" income that they
earned under the footage system by padding their hours.  That meant that Stellmach
reported *more* covered hours to the funds than his employees had worked and paid
*more* in fringe-benefit contributions to the funds than he was required to pay under the
CBAs.  The evidence at trial established that, over the course of the audit period, the
funds likely received thousands (or even tens of thousands) of dollars in overpayments
from Diamond.

Plaintiffs complain, however, that even if this is true, there may have been
particular *months* in which the funds were underpaid—and plaintiffs insist that they are
entitled to recover for those monthly underpayments, even if, over the course of the
five-year audit period, the total amount of overpayments far exceeded the total amount
of underpayments.  But the Court finds that any underpayment related to the Partains

would likely have been offset *during the same month* by overpayments related to the other employees.  Bear in mind that the Partains were essentially complaining about a zero-sum game:  They complained that were underpaid *because* the other tapers got the easier, faster work and therefore did better under the footage system.  In short, even if the Partains' hours were occasionally being underreported, the overpayments to other employees working footage (and the consequent over-reporting of their hours to the funds) negate any inference that, in any given month, the overall number of employee hours was underreported to the funds.

The Partains' testimony also fails to establish damages to the funds for a second reason.  Walter and Troy's most consistent and credible complaint is that they were shorted *overtime* pay.  But given the way that Diamond's footage system worked, an employee's loss of overtime pay would not necessarily establish a loss to the funds. Consider the following hypothetical:  Suppose that Walter was paid $1500 for a week's work under the footage system.  Suppose further that Walter's hourly wage at the time was $30.  Stellmach would have divided the footage rate ($1500) by the hourly wage ($30) and recorded Walter as having worked 50 hours (no matter how many hours Walter actually worked).  Accordingly, Diamond would have reported 50 hours of covered work to the funds—and made 50 hours' worth of fringe-benefit contributions on Walter's behalf.

If Walter had actually worked 50 hours, then he would have been paid less under the footage system than if he had been paid by the hour—because, had he been paid by the hour, he would have received overtime pay. Hence, rather than being paid $1500, Walter would have been paid something like $1650 (40 regular hours at $30 per hour and 10 overtime hours at $45 per hour). In this scenario, Walter would indeed have been deprived of $150 in overtime pay by the footage system—*but the funds still would have been paid the correct amount*. Walter worked 50 hours, and Diamond reported 50 hours. Indeed, it is quite possible for the funds to be *overpaid* even while Walter is *underpaid*.[10] For these reasons, Walter and Troy's focus on their loss of overtime pay substantially weakens any inference that the funds were underpaid.

Plaintiffs next point to evidence that Diamond improperly hired non-union subcontractors. But Diamond did so on only two isolated occasions, both of which were the result of an innocent mistake. Diamond made no effort to hide its use of the subcontractors, and Diamond did not dispute its resulting liability. This evidence is insufficient to raise an inference that Diamond ever intentionally evaded its obligations under the CBAs. In addition, because plaintiffs were able to calculate an exact,

---

[10]Suppose that it took Walter 48 hours to complete the work for which he was paid $1500 under the footage system. Suppose further that, had Walter been paid by the hour, he would have earned $1560 (which represents 40 regular hours at $30 per hour and 8 overtime hours at $45 per hour). Walter would have been shorted $60. But because Stellmach would have reported 50 hours to the funds, the funds would have been overpaid.

undisputed amount of damages for the Quality Sanders subcontract from Diamond's records, there is no reason to rely on a mathematical damages model that posits many times that amount in damages. *Cf. Laborers' Pension Fund v. A&C Envtl., Inc.*, 301 F.3d 768, 783 (7th Cir. 2002) ("[B]ecause A & C's records were adequate to permit the Funds' auditors to determine the amount of covered work that A&C employees performed and based on which the Funds seek contributions, the *Combs-Brick Masons* burden-shifting rule does not apply.")

Plaintiffs also point to evidence that Diamond carpenters sometimes performed tapers' work. In particular, when Stellmach was asked whether "it's not unusual for carpenters to perform taping work," he replied that "[i]t's not usual" and that "it happens once in a while possibly fire taping when there's no tapers on the job or something like that . . . ." TT 604. This testimony is inadequate to establish the fact of damage. There is no indication whether or how often this practice occurred during the audit period. In light of the evidence that the funds were regularly and substantially overpaid, this fleeting, vague reference to carpenters "possibly" performing minimal taping work "once in a while" does not establish that the funds were ever actually underpaid.

Finally, plaintiffs argue that Stellmach falsified and destroyed records and that this alone indicates that Stellmach was out to cheat the funds. The Court strongly

disagrees. Having closely observed Stellmach's demeanor, the Court is confident about two things: First, Stellmach is scrupulously honest. And second, Stellmach is an unsophisticated business person. There is no reason to believe that Stellmach acted in bad faith when he threw away timecards and other records. Instead, Stellmach likely believed that it was sufficient for him to give the information in those records to his wife, who recorded it in her ledgers and accounting software. After all, the funds regularly audited Diamond and never told Diamond that its records were inadequate. And while it is technically true that Stellmach "falsified" his employees' hours, he did so by reporting *more* hours than his employees had actually worked, to the benefit of the funds and the employees. If Stellmach's intent were to cheat the funds, he did a remarkably poor job. The much more reasonable inference is that the testimony given by Stellmach and his tapers was true: Both the intent and the effect of the footage system was to give tapers an incentive to work quickly by paying them more than they would earn if they were paid by the hour.

In short, the Court finds that plaintiffs have failed to prove—either with respect to any particular month or with respect to the audit period as a whole—that Diamond paid less in fringe-benefit contributions than it was required to pay under the CBAs. To the contrary, the evidence strongly indicates that the funds were consistently overpaid by Diamond.

10.     Even if the Court is incorrect—that is, even if plaintiffs have shown that they suffered some damage—plaintiffs have not offered sufficient evidence to show the amount and extent of their total damages "as a matter of just and reasonable inference." *See Anderson*, 328 U.S. at 687.

Based on the testimony of their experts, plaintiffs contend that Diamond failed to report approximately 60,000 hours during the audit period.  This is a ridiculous contention, and it is not supported by any credible evidence.

To begin with, the methodology of plaintiffs' experts suffers from a number of problems.  Siiro's calculation of the square footage that Diamond finished during the audit period is almost certainly overstated by approximately ten percent.  In addition, the productivity rate that plaintiffs used—82.5 square feet per hour—is based on highly questionable data and is far too slow.  Chapman derived this rate (on which Siiro relied) using five sources of data, four of which were unreliable and not particularly relevant to either the Minnesota market or the construction of wood-frame multi-family housing. *See also* TT 879-80, 1075-76 (plaintiffs' rate would not be competitive in the Minnesota market).  In contrast to this dubious, hypothetical rate, there was direct and far more reliable evidence—gleaned from the Five15 project—that Diamond's actual productivity rate was 116 square feet per hour, a rate that was over 40 percent faster than Chapman's estimate.

In addition to the problems with the assumptions and data underlying Siiro's damages calculation, his conclusions make no sense.  Again, only ten or eleven tapers ever worked footage during the five-year audit period.  Yet Siiro estimates that Diamond cheated those *ten or eleven tapers* (and thus the funds) out of 59,531 hours.  For that to be true, each of the ten or eleven tapers would have had to have been shorted about 1,000 hours *per year* for each of the five years of the audit period.  In other words, each and every year, those ten or eleven tapers would have been cheated out of roughly *half* of their wages (if they worked 2000 hours per year, as do typical full-time employees).

Siiro's figures become even more preposterous after they are adjusted to exclude the tapers (both those paid on footage and those paid by the hour) who testified under oath that they had never been shorted hours.  (These tapers appear to have performed a disproportionate share of the taping work during the audit period.)  If Siiro's figures were correct, then every other Diamond taper—*including those who were not paid on the footage system*—would have worked nearly two hours for each hour that they were paid. D250; D243; TT 1120-22.  Further adjusting the numbers to exclude *all* hourly employees, the remaining footage employees would have had to have worked an average of three hours for every one hour of pay.  D251; D244; TT 1123-24.  It defies

belief that unionized tapers would allow themselves to be cheated out of half to two thirds of their pay.

In an attempt to make Siiro's testimony seem slightly less absurd, plaintiffs contend that Diamond may have cheated the funds in ways that did not involve the footage system, such as through improper subcontracting or the use of carpenters to perform tapers' work.  Again, however, the evidence of these practices is almost nonexistent, and the minimal evidence that does exist is inconsistent with any inference that Diamond was trying to cheat anybody.  On a broader level, having closely observed the Stellmachs' testimony and demeanor at trial, the Court rejects out of hand plaintiffs' suggestion that the Stellmachs were part of a large-scale conspiracy to cheat the funds.  As noted, David Stellmach appears to be an honest and fair man who knows a lot about managing drywall projects and not very much about running a business.  He is obviously unsophisticated, and while testifying he struggled to grasp even fairly simple legal concepts.  In addition, as Walter Partain admitted, Stellmach is "not an intimidating guy"; to the contrary, he presents as a gentle man who is much more comfortable on a worksite than in an office.  TT 810.  For her part, Karen Stellmach struck the Court as a woman of integrity who is extremely conscientious about her work.  No objective person, having observed the Stellmachs testify, could possibly

conclude that they engaged in extensive, systematic fraud and managed to hide it by intimidating employees into silence.

In sum, the Court finds that Siiro's testimony regarding the number of Diamond's unreported hours meets none of the criteria of Fed. R. Evid. 702, and the Court therefore excludes that testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). The Court further finds that plaintiffs have failed to introduce sufficient evidence to show that Diamond underreported hours for any particular month, much less "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687. Finally, even if the Court is mistaken—and even if plaintiffs' evidence is sufficient to shift the burden to Diamond—the Court finds that Diamond introduced "evidence to negative the reasonableness of the inference to be drawn from [plaintiffs'] evidence." *Id.* at 687-88.

Diamond is not liable to plaintiffs, save for the amount attributable to Diamond's use of Quality Sanders.

11.     Plaintiffs are entitled to recover the undisputed amounts set forth on the Quality Sanders invoice.

Diamond argues that the Court should not award anything in connection with its subcontract with Quality Sanders because those damages were likely offset by

Diamond's overpayments to the funds. Diamond's factual premise may be correct, but without concrete evidence from Diamond about the dates and amounts of its overpayments, the Court cannot find that Diamond has rebutted the Quality Sanders invoice. Diamond admits that the invoice is accurate, and, unlike Diamond's evidence regarding its overpayments, the invoice is specific as to dates and amounts.

Plaintiffs are therefore entitled to recover $61,881.41 in delinquent contributions and $6,188.14 in liquidated damages for the Quality Sanders subcontract.

### 3.   Lincoln

12.    Plaintiffs have failed to show that Lincoln underpaid the funds during the audit period.

No Lincoln employee testified that he was ever shorted hours, much less that the fund was shorted contributions. Dustin and Walter Partain could say only that they do not know if they were ever shorted hours by Lincoln.

The only other possible evidence that Lincoln underpaid the funds is the Joint Trade Board award and bankruptcy claim against Lincoln. But the evidence at trial established that the Joint Trade Board award included expenses, wages to office employees, and bonus payments to tapers on which fringe-benefit contributions were not owed. Plaintiffs have not claimed that the award by itself establishes the fact of

damages, *see* TT 887, and given the unreliability of the award, the Court declines to draw any such inference.

Nor does the Court draw any inference from Lincoln's destruction of records. Dvorak (Lincoln's owner) disposed of Lincoln's records in the regular course of business and after Lincoln filed for bankruptcy. The general tenor of Dvorak's testimony indicated that he discarded records because he no longer needed them, not because he was trying to hide anything.

Plaintiffs have failed to prove that Lincoln underpaid the funds.

13. Even if plaintiffs had been able to prove that they suffered some damage on account of Lincoln underpaying the funds, plaintiffs have not offered sufficient evidence to show the amount and extent of the damage "as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.

Plaintiffs' expert evidence is even more flawed with respect to Lincoln than it was with respect to Diamond, and thus that evidence is excluded under Fed. R. Evid. 702 and *Daubert*. Siiro did not know the amount of square footage that Lincoln finished during the audit period, so he simply took the cost-per-hour figure that he derived from his Diamond calculations and divided it into Lincoln's gross billings to come up with the number of hours that Lincoln should have reported. But Lincoln's billings included costs for materials and labor other than taping, TT 1354-55, and therefore Siiro's method

substantially overstates the number of hours attributable to taping.  Moreover, Siiro's

cost-per-hour figure is itself based on flawed data concerning Diamond's square footage

and productivity rate.

Plaintiffs have failed to prove any damages attributable to Lincoln.

*C.  David Stellmach*

14.     Plaintiffs have abandoned their claim that David Stellmach is personally

liable to them.

In their complaint, plaintiffs alleged that Stellmach is personally liable for

Diamond's delinquent contributions because he failed to post the security bonds

required by the CBAs.  Compl. ¶ 182.  As noted, the Court dismissed this claim to the

extent that it was based on the CBA that took effect on May 1, 2012.  ECF No. 55 at 4-5.

Diamond's liability for the Quality Sanders invoice apparently arose under an earlier

CBA, however, which means that Stellmach is potentially liable for those contributions.

At the end of trial, the Court informed the parties that it would order post-trial

briefing.  The Court explicitly instructed plaintiffs that, in their post-trial briefing, they

must be "clear" and "very specific" as to "what you're seeking from me with respect to

each defendant."  TT 1896.  In its formal post-trial briefing order, the Court reiterated

this requirement:

> Plaintiffs' brief must specifically describe the relief being
> sought from each defendant, identify the legal theory or

> theories supporting that claim for relief, and provide
> supporting analysis.

ECF No. 333 at 2.

Despite these admonitions, plaintiffs' post-trial brief did not say a word about the personal liability of Stellmach or cite evidence that the contractual preconditions for such liability were met. The Court therefore treats plaintiffs' claim for personal liability against Stellmach as abandoned.

### D. Twin Cities

15.    The Court will not award any relief against Twin Cities.

Defendant Twin Cities is in default. ECF No. 24. In their complaint, plaintiffs allege that Twin Cities is the successor to Lincoln, that it is liable for Lincoln's debts, and that Lincoln's bankruptcy proceeding does not preclude an award of damages. The Court does not understand plaintiffs to assert a standalone claim that they are entitled to relief against Twin Cities solely by virtue of the fact that the bankruptcy court allowed the funds' claim against Lincoln. *See* TT 884-85. Plaintiffs have not briefed such a claim nor contended, for example, that Twin Cities is bound by the bankruptcy court's allowance of the claim or the amount of that claim. Indeed, plaintiffs barely mention Twin Cities in their post-trial brief, which suggests that they may no longer be seeking relief from Twin Cities.

In any event, the Court understands plaintiffs to have subsumed all of their alleged Lincoln damages—including the damages that were a part of the bankruptcy proceeding—into their experts' calculations. The Court has excluded that expert evidence under Fed. R. Evid. 702 and *Daubert*, and hence there is no basis to award damages against Twin Cities. Moreover, plaintiffs have not sought any equitable relief against Twin Cities, most likely because Twin Cities is not a signatory to the painters' union CBA.

## E. Statute of Limitations

16.     There is no basis for extending the statute of limitations beyond the beginning of the audit period.

The statute of limitations for both ERISA and contract claims in Minnesota is six years. *Robbins v. Iowa Rd. Builders Co.*, 828 F.2d 1348, 1355 (8th Cir. 1987); Minn. Stat. § 541.05, subd. 1(1). Accordingly, discovery in this case was sensibly limited to the six-year period preceding the filing of plaintiffs' complaint—that is, August 15, 2007 through August 15, 2013. ECF No. 175. At the very end of their post-trial brief, plaintiffs throw in a one-sentence assertion that they are entitled to audit defendants for the period January 1, 2005 through August 15, 2007. Plaintiffs do not articulate any legal basis for this argument, but, based on their citation to a single district-court case,

they appear to be making some kind of equitable-tolling argument on the basis of alleged fraudulent concealment.

Although plaintiffs say that they are seeking an audit of "defendants," there can be no doubt that they are really seeking to audit Frana, which is the big fish in this small pond. But plaintiffs have failed to prove that Frana is an alter ego of either Diamond or Lincoln, and thus plaintiffs have no legal basis for auditing Frana. Setting that aside, there is no basis to extend the statute of limitations as to any defendant, because there is no evidence that any defendant engaged in fraudulent concealment.

As the Court found after the first phase of trial, Stellmach did not act in bad faith when he disposed of time cards and other records. ECF No. 328 at 4-5. Both David and Karen Stellmach reasonably believed that they were keeping adequate records and complying with plaintiffs' audits. Similarly, Dvorak disposed of Lincoln's records only after the company went bankrupt and he had no further need for the records; there is no evidence that Dvorak discarded Lincoln's records in an attempt to conceal any liabilities to plaintiffs.

The Court finds no basis to toll the statute of limitations.

### F. Attorney's Fees

17.     The Court will not award attorney's fees to Frana under 29 U.S.C. § 1132(g)(1).

In its post-trial brief, Frana argues that it should recover its attorney's fees.

Under § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee

and costs of action to either party." There is no presumption that the prevailing party is

entitled to recover its fees. *Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966, 971-72

(8th Cir. 2002) (rejecting presumption in favor of prevailing plaintiffs).

In *Lawrence v. Westerhaus*, 749 F.2d 494 (8th Cir. 1984) (per curiam), the Eighth

Circuit set forth a list of factors that a court should consider in weighing whether to

award attorney's fees under § 1132(g)(1): (1) the opposing parties' culpability or bad

faith; (2) the opposing parties' ability to satisfy an award of attorney's fees; (3) whether

a fee award could act as a deterrent; (4) whether the prevailing party sought to benefit

all participants and beneficiaries of an ERISA plan or to resolve a significant legal

question; and (5) the relative merits of the parties' positions. *Id.* at 496.

Considering these factors, the Court concludes that an award of attorney's fees to

Frana is not warranted. Plaintiffs' claim that Diamond was Frana's alter ego was not

frivolous. Plaintiffs' claim that Lincoln was Frana's alter ego was more tenuous, but

also not frivolous. Plaintiffs had a good-faith basis for suspecting that Diamond and

Lincoln had underpaid the funds—and the absence of accurate, contemporaneous

records (which was due to the possibly unlawful actions of Diamond and Lincoln)

meant that plaintiffs had to undertake the difficult task of reconstructing what had

happened.  At bottom, the Court cannot fault plaintiffs for bringing a lawsuit, for

including Frana as a defendant, or for initiating the discovery process—all of which

plaintiffs appear to have done in a sincere attempt to benefit the funds.[11]  The Court

declines to award attorney's fees to Frana.

18.      Because plaintiffs have prevailed on a small portion of their claim against

Diamond, they appear to be entitled to recover reasonable attorney's fees under 29

U.S.C. § 1132(g)(2).  The Court will leave a final determination regarding any fee award

to post-judgment motion practice.  The Court warns plaintiffs, however, that the Court

is highly unlikely to award more than a modest sum.  Plaintiffs determined the amount

of the Quality Sanders deficiency via an audit long before they filed this lawsuit, and

Diamond has never contested either the fact or amount of its liability.  As is common in

this District, any lawsuit based on such liability would likely have been resolved by

entry of a default judgment—and, because the amount of the liability was already fixed,

the attorney's fees and costs awarded in such a default proceeding would have been

minimal.

---

[11]In its post-trial brief, Frana indicates an intent to move for sanctions against
plaintiffs under Fed. R. Civ. P. 11.  The Court is likely to take a dim view of any such
motion.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Plaintiffs shall recover $61,881.41 in delinquent contributions and

$6,188.14 in liquidated damages, for a total of $68,069.55, from defendant

Diamond Drywall, Inc.

2.      Plaintiffs shall recover nothing on their claims against the remaining

defendants.

3.      Plaintiffs' motion seeking a negative adverse inference [ECF No. 282] is

DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 30, 2017                          s/Patrick J. Schiltz
                                                Patrick J. Schiltz
                                                United States District Judge